**ND&S** NICOLL DAVIS & SPINELLA LLP
95 Route 17 South, Suite 316
Paramus, New Jersey 07652
(201) 712-1616
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JPS COLLISION, INC., individually and on behalf of all those similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>AMERICAN INTERNATIONAL GROUP, INC; AIG RISK MANAGEMENT INC.; AMERICAN HOME ASSURANCE COMPANY; AIU INSURANCE COMPANY; AMERICAN FUJI FIRE AND MARINE INSURANCE COMPANY; CHARTIS PROPERTY CASUALTY COMPANY; COMMERCE AND INDUSTRY INSURANCE COMPANY; GRANITE STATE INSURANCE COMPANY; ILLINOIS NATIONAL INSURANCE COMPANY; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA; NEW HAMPSHIRE INSURANCE COMPANY; AIG RISK MANAGEMENT, INC.; MAURICE R. GREENBERG; and DOES 1 through 10 inclusive,<br><br>        Defendants. | Civil Action Number:<br><br><br><br><br><br><br><br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

### INTRODUCTION

1.    This is a class action brought by New Jersey employers seeking restitution,

disgorgement, compensatory, punitive, and treble damages, a constructive trust, and injunctive

1

relief arising from Defendants' long-term, unlawful, and fraudulent underreporting of workers' compensation ("WC") insurance premium, evasion of related financial obligations, and abuse of their statutory, regulatory, common law, and fiduciary responsibilities with regard to WC policies issued to businesses that employ workers in the State of New Jersey. By engaging in a systematic underreporting of WC premiums written, Defendants not only wrongly enriched themselves in various ways,  but their systematic practice of underreporting WC premium caused Plaintiff and other WC policyholders in New Jersey to pay improperly inflated state insurance surcharges and to suffer other damage. Defendants have admitted to substantially all of the conduct giving rise to the claims asserted herein.

2.      Plaintiff, for itself and all others similarly situated ("Class Members"), brings this action pursuant to the Racketeering Influenced Corrupt Organizations Act (18 U.S.C. §§ 1962 *et seq*.) ("RICO") and New Jersey Consumer Fraud Act (N.J. Stat. §§ 56: 8-1, *et seq*.) ("CFA"). Plaintiff also asserts claims for common law fraud, negligent misrepresentation, and unjust enrichment.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Plaintiff's claims arise under the laws of the United States, including without limitation, RICO, 18 U.S.C. § 1964.

4.      Subject matter jurisdiction also exists pursuant to the Class Action Fairness Act of 2005 (28 U.S.C. § 1332(d)), because at least one class member is of diverse citizenship from one Defendant; there are more than 100 class members; and the aggregate amount in controversy exceeds $5,000,000.

5.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District because a substantial part of the events giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. § 1391(b)(2). Venue also is proper because Defendants reside in this District, are found in this District, have an agent in this

District, transact affairs in this District, and/or the ends of justice require that any parties residing in other districts be brought before this District Court.

7.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including without limitation, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets and exchanges.

**PARTIES AND RELEVANT ENTITIES**

**PLAINTIFF**

8.     Plaintiff JPS Collision, Inc. ("JPS Collision") is a New Jersey corporation with its principal place of business in Newark, New Jersey.  JPS Collision operates an automobile repair business in Newark.   From approximately 1999 through the present, JPS Collision has employed between 6 and 15 New Jersey workers and was required under New Jersey law to have in effect a policy of WC insurance that would cover the potential work-related injury claims of its New Jersey workers.   During this timeframe, JPS Collision purchased WC insurance from different insurers as further described below.

9.     Plaintiff brings this action on its own behalf and as a representative of a class of individuals and entities similarly situated.

**DEFENDANTS**

10.     Defendant American International Group, Inc. ("AIG") is a Delaware corporation with its principal place of business in New York. AIG is a publicly-traded holding company which, through its subsidiaries and affiliates, engages in a broad range of financial and insurance-related activities in the United States and throughout the world. AIG, through its subsidiaries and affiliates, is the largest underwriter of commercial and industrial insurance in the U.S.

11.     AIG directs and controls, and at all times material to this Complaint directed and controlled, the activities of its affiliates and subsidiaries ("AIG Companies"), which collectively have been considered by the National Association of Insurance Commissioners as the "AIG

Group," or "NAIC Group # 0012." As used in this Complaint, "AIG Group" refers collectively to AIG and AIG Companies.

12.     Defendant American Home Assurance Company ("AHAC"), formerly known as American Home Fire Assurance Company, is a New York corporation with its principal place of business in New York. It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint. During the relevant years, AHAC, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

13.     Defendant AIU Insurance Company ("AIU"), formerly known as American International Insurance Company, is a New York corporation with its principal place of business in New York. It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint.  During the relevant years, AIU, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

14.     Defendant American Fuji Fire and Marine Insurance Company ("AFF") is an Illinois corporation with its principal place of business in Pennsylvania. It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint. Beginning in approximately 1991, AFF, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

15.     Defendant Chartis Property Casualty Company ("CPC"), formerly known as AIG Casualty Company and/or Birmingham Fire Insurance Company of Pennsylvania, is a Pennsylvania corporation with its principal place of business in New York. It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint. During the relevant years, CPC, its alternate entities, and

each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

16.    Defendant Commerce and Industry Insurance Company ("CII") is a New York corporation with its principal place of business in New York. It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint. During the relevant years, CII, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

17.    Defendant Granite State Insurance Company ("GSI"), formerly known as Granite State Fire Insurance Company, is a Pennsylvania corporation with its principal place of business in New York. It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint. During the relevant years, Granite State Insurance Company, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

18.    Defendant Illinois National Insurance Company ("INIC") is an Illinois corporation with its principal place of business Illinois.  It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG.  It is an AIG Company as that term is used in this Complaint.  During the relevant years, INIC, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

19.    Defendant Insurance Company of the State of Pennsylvania ("ICP") is a Pennsylvania corporation with its principal place of business in New York, New York. It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint. During the relevant years, ICP, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

20.     Defendant National Union Fire Insurance Company of Pittsburgh, PA ("NUF"), is a Pennsylvania corporation with its principal place of business in New York, New York. It is, and at all times material to this Complaint was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint. During the relevant years, NUF, PA, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

21.     Defendant New Hampshire Insurance Company ("NHI"), formerly known as New Hampshire Fire Insurance Company, is a Pennsylvania corporation with its principal place of business in New York. It is, and at all times herein relevant was, a subsidiary and/or affiliate of AIG. It is an AIG Company as that term is used in this Complaint. During the relevant years, NHI, its alternate entities, and each of them, were licensed to transact WC insurance business in the State of New Jersey, and did transact such business, issuing policies to members of the Class.

22.     AIG Risk Management, Inc. ("AIG-RMI") is a New York corporation with its principal place of business in New York. It was a subsidiary and/or affiliate of AIG and CPC. It is an AIG Company as that term is used in this Complaint. During the relevant years, AIG-RMI, its alternate entities, and each of them, were the underwriting arm of AIG.

23.     AIG Companies have been major participants in the New Jersey WC market for decades.

24.     Defendant Maurice R. Greenberg ("Greenberg") is an individual residing in Key Largo, Florida. Greenberg joined AIG in approximately 1967 and served as the Chairman and Chief Executive Officer of AIG until his forced resignation in March 2005. In his capacity as head of AIG, Greenberg was responsible for conducting the business operations of AIG and the AIG Companies. He orchestrated and carried out the false reporting schemes that give rise to this civil action.  Greenberg is the Chairman and Chief Executive Officer for C.V. Starr & Co., Inc. as further described below.

**OTHER RELEVANT INDIVIDUALS AND ENTITIES**

25.    Thomas R. Tizzio ("Tizzio") is an individual residing in Middletown, New Jersey. Tizzio joined AIG in approximately 1967 and served as a director on its board from 1986 to 2006 approximately. He has held numerous management roles, including Senior Vice Chairman of General Insurance at AIG, Chairman of AIU, and, from 1991 to 1997, AIG President. In those and other capacities, Tizzio was responsible for conducting the business operations of AIG and the AIG Companies. He orchestrated and carried out the false reporting schemes that give rise to this civil action.

26.    Richard L. Thomas ("Thomas") managed AIG's Office of Workers' Compensation prior to 1996 and subsequently served as a Senior Vice President and Chief Underwriting Officer. In those and other capacities, Thomas was responsible for conducting the business operations of AIG and the AIG Companies. He orchestrated and carried out the false reporting schemes that give rise to this civil action.

27.    Joseph C. Smetana ("Smetana") is an individual residing in Rockville Centre, New York. Smetana is a former President and Chairman of AIG-RMI. During one or more of the relevant years, he also served as Chairman of the Commercial Lines Division of AIU. In those and other capacities, Smetana was responsible for conducting the business operations of AIG and the AIG Companies. He orchestrated and carried out the false reporting schemes that give rise to this civil action.

28.    Tizzio, Thomas, and Smetana are collectively referred to hereafter as the "Other Senior Managers."

29.    C.V. Starr & Co., Inc. ("CVSCO") is an investment holding company organized and existing under the laws of Delaware with its principal place of business in New York, New York.  Although founded by Cornelius Vander Starr, who also founded AIG, AIG has never had any ownership interest in CVSCO at any time material to this Complaint.  At all times material to this Complaint, CVSCO was a minority shareholder in AIG.  Until at least 2005, CVSCO's business activities were conducted by individuals who were officers and/or directors of AIG

and/or AIG Companies.

30.    Starr International Company, Inc. ("SICO") is a corporation organized and existing under the laws of Panama, with a principal place of business in Bermuda.  Although founded by Cornelius Vander Starr, who also founded AIG, AIG has never had any ownership interest in SICO at any time material to this Complaint.  At all times material to this Complaint, SICO was a minority shareholder in AIG.  Until at least 2005, SICO's business activities were conducted by individuals who were officers and/or directors of AIG and/or AIG Companies.

## FACTS PERTAINING TO ALL CLAIMS

**FUNDING OF STATE WC INSURANCE PROGRAMS**

31.    The WC insurance market is, in many states, comprised generally of two sub-markets: the "voluntary" market and the "residual" market.  The voluntary market provides coverage for companies that are able to purchase WC insurance in the open market. Some higher risk companies are unable to secure WC insurance in the open market (because, for example, their work is particularly dangerous or they have a poor loss record); those companies typically obtain WC insurance in the residual market, which in many states is also referred to as the "assigned risk" market. In such states, insurers that participate in the voluntary market are required by law to participate in the residual market, where the obligation to insure a particular company may be "assigned" to an insurer, under rates and terms specified by law. Through certain state- or industry-run pooling arrangements, some of the cost of providing insurance to the residual market is allocated to the voluntary market to ensure that companies can obtain assigned risk coverage if necessary. This system is predicated on voluntary market insurers acting truthfully in their disclosure of annual WC premium and other financial reporting. In New Jersey, the residual market is covered by a state-administered Fund, in which member insurers offer policies to cover the residual market at rates set by a government bureau.  The New Jersey Workers Compensation Plan ("NJWCP") sets the residual market rates and is administered by the New Jersey Compensation and Rating Inspection Bureau.

32.    Often state insurance regulators require insurers to report the amount of WC

insurance premium (and other types of insurance premium) that the insurers write in the state. Many states use this data in order to allocate the costs of the residual market and pass those costs along to the insurers that participate in the voluntary market.

33.     Many states, including New Jersey, use the insurers' disclosure of WC premium and financial reporting in another way. These states administer certain special purpose funds – such as guaranty funds, fraud investigation funds, and the like. In some states, including New Jersey, the state pays for some or all of the cost of administering these funds by way of direct pass-through surcharges or assessments made on policyholders.

34.     To administer the special purpose funds that are financed through surcharges or assessments passed through directly to policyholders (hereafter, "SPFs"), state insurance regulators aggregate WC insurers' premium data to determine the total amount of WC insurance written in the state for a given year. They then compare that total to the amount of money necessary to fund the SPFs in question, calculating what percentage of the aggregate WC insurance written in the state this amount equates to. Thereafter, regulators instruct insurers to pass through to policyholders an assessment or surcharge equivalent to that percentage of the policyholder's premium. In this way, each policyholder in the state pays its own *pro rata* share of funding the SPFs.

35.     For example, if a state has a WC Special Injury Fund and state regulators know that they need $1 million to operate that fund, and they know that all private insurers wrote an aggregate premium amount of $100 million in WC insurance in the state the prior year, they would determine that they need to institute a 1 percent surcharge or assessment on all policyholders for the coming year. In this example, the state regulators would instruct insurers in the private market, as well as those with plans offered through the NJWCP, to add to each policyholder's invoice a line-item surcharge equivalent to 1 percent (in New Jersey, a quarter of 1 percent) of the policyholder's WC insurance premium, as the guaranty fund surcharge. The insurers collect this surcharge as a part of their invoicing process and remit the surcharge to the appropriate state officials.

36.   If an insurer provides the state inaccurate information about the amount of WC insurance premium it writes in the state, the state's calculations will be skewed. For instance, if an insurer underreports the amount of WC insurance it writes in the state, this would inflate the direct pass-through surcharge or assessment percentage that the state perceives is necessary to fund SPFs. In the example above, if a WC insurer falsely reported that it collected $25 million less in premium than it actually collected, the state regulators would still need $1 million to operate their guaranty fund; but, incorrectly believing that all private insurers, including those issuing policies through the NJWCP, wrote an aggregate premium of $75 million in the state (rather than the $100 million actually written), the regulators would believe that they needed to impose a surcharge of 1.3%, instead of 1%, to cover the cost of administering the guaranty fund. As a result all policyholders in the state would pay an inflated surcharge that year.

37.   Defendants knowingly and intentionally provided false financial information to the State of New Jersey, including false information about the amount of WC insurance premium written in New Jersey. As a direct result, Plaintiff and Class Members were injured.

## AIG CARRIED OUT A MASSIVE WC INSURANCE UNDERREPORTING FRAUD OVER A PERIOD OF CLOSE TO 40 YEARS

38.   Beginning in approximately 1970, Defendants devised, implemented, participated in, and carried out nationwide schemes – later characterized by AIG's own General Counsel as "permeated with illegality" – to mis-categorize, falsely report, and falsely book the AIG Companies' WC premium as other premium (for example, as "general liability" premium), in order to reduce Defendants' expenses, inflate their profits, and unjustly enrich themselves at the expense of Plaintiff and the Class.

39.   Defendants regularly issued falsified certified annual financial reports and other materials that underreported WC premium figures, for the purpose and with the effect of evading AIG's and the AIG Companies' equitable shares of financial responsibility for state-levied taxes and assessments.

40.   Defendants' underreporting was fraudulent and had the purpose and effect of

misleading state insurance regulators as to both the total amount of WC premium written in a given state and AIG Companies' *pro rata* share of that total. This benefitted Defendants by allowing them to avoid certain premium taxes. Defendants expected and intended that their fraudulent underreporting would also have the effect of causing the state to mis-calculate the percentage surcharges necessary to administer SPFs, and as a direct result, that Plaintiff and Class Members would pay artificially inflated amounts for the SPFs passed directly through to them. When Defendants underreported premium, policyholders throughout the state paid artificially inflated pass-through surcharges and assessments. This was equally true of individual policyholders insured by Defendants and those insured by Other Insurers alike—each policyholder who purchased WC insurance in New Jersey during the years that Defendants underreported the amount of premium that they had collected was subjected to the higher surcharge, calculated by state regulators as the amount necessary to fill the SPF coffers based on the incorrectly reported, lesser amount of aggregate WC premium volume that the Defendants reported.

41.  In order to conceal the fraudulent scheme from state regulators, non-AIG-affiliated insurers ("Other Insurers"), and policyholders, Defendants maintained multiple sets of financial books and records. They maintained an accurate set of books and records that tracked the amount of WC premium they collected from their policyholders, as well as the actual amount of state-mandated pass-through surcharges that they collected from their policyholders. They maintained a false set of books and records that tracked the inaccurate, lesser amount of WC premium that they reported to New Jersey state regulators, as well as the lesser amount of aggregate SPF surcharges, which they had collected from their policyholder, that they then remitted to state regulators. Only the false set of books and records were made available to state auditors.

42.  Defendants remitted to the state only that amount of the policyholder surcharges that the state expected to receive based on Defendants' falsely underreported WC insurance premium. Defendants wrongfully retained the difference between the higher aggregate amount

collected from policyholders and the lower amount remitted to the states. Using the example above, if Defendants had underreported that they collected $75 million of WC premium in a year when they actually collected $100 million, and state regulators levied a guaranty fund surcharge of 1.3 percent for that year based on the inaccurate total amount of reported premium across all insurers, Defendants would pass-through the inflated percentage to their policyholders and thereby receive $1.3 million from their collective policyholders as payment of the guaranty fund surcharge that year (1.3 percent of $100 million); but the state would expect to receive only $975,000 from Defendants in guaranty fund surcharges for that year (1.3 percent of the $75 million in WC premium that Defendants had reported collecting). Thus, Defendants remitted only $975,000 to the state and kept the difference—in this example, $325,000—so that state regulators were not tipped off to the premium underreporting by virtue of a mismatch between the aggregate amount of surcharges actually collected by WC insurers and the aggregate amount of surcharges that the state expected would be collected by WC insurers based on the lesser amount of premium that has been reported by Defendants.  In this manner, the fraudulent underreporting of WC insurance premium allowed Defendants to not only evade premium taxes they otherwise owed but also to unlawfully profit from the state-mandated surcharges that they levied on their policyholders.

43.     As a result of Defendants' underreporting, state regulators assigned to Defendants and to Other Insurers a greater percentage of state assessments than would have been the case if Defendants had been truthful. The higher assessments were directly charged to, and paid by Plaintiff and Class Members. The Other Insurers were ignorant of the fraud, and Plaintiff and Class Members were ignorant of the fraud.

44.     Defendants engaged in this misconduct for approximately four decades commencing in approximately 1970 for the purpose of unjustly enriching themselves by evading their fair share of state-levied, workers'-compensation-related taxes and by not remitting to the state the entirety of the Special Purpose Fund surcharges that they collected from their insureds.

45.    Defendants' knowing and intentional misreporting caused employers who purchased WC insurance in the State of New Jersey to pay more than they legally should have paid, without their knowledge or consent, in violation of state and federal laws.

46.    Defendants knowingly and intentionally engaged in these false reporting schemes to gain the unjust benefit these schemes conferred on the Defendants, at the expense of Plaintiff and the Class. Defendants expected and intended that the AIG Companies' false statements of WC premium would be used as the basis to calculate the Special Purpose Fund assessments levied by the states and paid by policyholders. AIG Companies' underreporting made it appear to state insurance regulators that the total volume of WC premium collected by insurers state-wide was lower than it actually was, and that AIG Companies' proportionate share of the WC insurance market was substantially smaller than it actually was. Based thereon, state regulators unknowingly inflated the Special Purpose Fund assessments levied on policyholders. Defendants knowingly (and Other Insurers unknowingly) passed along inflated Special Purpose Fund assessments to their policyholders.

47.    Defendants expected and intended that these improperly inflated costs would be passed on to policyholders because Defendants were subject to laws mandating that these costs be passed on to policyholders and because Defendants passed along these costs to their own policyholders.

48.    Defendants expected and intended that states, including the State of New Jersey and its agencies, departments, and regulators, as well as Other Insurers and insured employers doing business in New Jersey, all would rely on the accuracy of Defendants' reported data, to the financial detriment of these entities and individuals, yet Defendants continued to perpetrate these fraudulent practices for decades.   The State's miscalculations were the intended, foreseeable, and natural consequence of Defendants' fraud.

49.    Without knowledge of the fraud, Plaintiff and the Class Members relied on, complied with, and paid the improperly inflated surcharges passed along to them by their insurers, and Defendants knew that Plaintiff and the Class would so rely.

50.     Defendants formulated and executed these fraudulent acts and omissions under the direction and leadership of Greenberg and other members of AIG's management team. AIG Chairman Greenberg bore direct responsibility for the supervision and oversight of AIG's day-to-day operations, including the fraudulent AIG programs to which AIG has now admitted. He was personally aware of and approved the scheme. The Other Senior Managers also knowingly participated in the fraud, including a cover-up and destruction of relevant evidence described below.

51.     Defendants' scheme generated significant financial benefits for Defendants, including substantially increasing the profits of AIG Companies and, ultimately, of AIG. For their role in fraudulently increasing the profits of Defendants, Greenberg and the Other Senior Managers received substantial compensation, bonuses, and other rewards, above and beyond what they would otherwise have received.  For instance, Greenberg, the Other Senior Managers, and the persons responsible for conducting the business operations of AIG Companies received additional compensation, bonuses and other rewards outside the normal course of AIG's business, from the award of interests in or compensation from C.V. Starr & Co. and/or Starr International Company, Inc., third parties that were stockholders of, but were otherwise unrelated to, AIG.  This incentivized those individuals to maximize the profitability of AIG, including by use of the WC underreporting scheme.

52.     The schemes to defraud Plaintiff and the Class relied upon the use of the mail. On numerous occasions since approximately 1970 AIG, Greenberg, and the Other Senior Managers knowingly and with the intent to defraud Plaintiff and the Class, among others, caused and directed AIG Companies to send via the U.S. Mail materially false and misleading financial statements and reports that underreported AIG Companies' WC premium. In addition, on numerous occasions during the relevant years, AIG, Greenberg, and the Other Senior Managers knowingly and with the intent to defraud Plaintiff and the Class, among others, directed AIG Companies and others to use the U.S. mail and/or wire transmission to send checks or other payment forms that underpaid the AIG Companies' lawful and proper share of Special Purpose

Fund assessments owed to the SPFs. Each use of the mail to send falsified premium figures, and each use of the mail and/or wire transmission to send checks or other payment forms, constituted a separate and independent violation of the mail fraud statute and/or the wire fraud statute that occurred in furtherance of the overall scheme to unlawfully profit from the underreporting of WC premium.

**THE FRAUD IN NEW JERSEY**

53.    Defendants carried out the above-described fraud in the State of New Jersey, to the detriment of Plaintiff and the members of the Class.

54.    During the relevant years, AIG Companies operated as WC insurers within the State of New Jersey. As part of their privilege to operate within this state, Defendants, and each of them, were and are subject to state statutory and regulatory laws relevant to WC.

55.    Subject to the laws of the State of New Jersey, the New Jersey Commissioner of Labor ("NJCOL") levies, and has during all or substantial part of the relevant years levied, on all insurers issuing WC policies in New Jersey, assessments in an amount that the NJCOL deems necessary to fund, among other programs, the Second Injury Fund ("SIF") and the Uninsured Employer's Fund ("UEF").   By statute, this amount is 125% (was 150% prior to 2008) of the compensation and benefits estimated by the NJCOL to be payable from the SIF during the following calendar year plus 100% of the amount estimated to be necessary for cost of administration of the Division of Workers' Compensation, less the estimated amount of net assets exceeding $5,000,000.00 which will remain in the SIF on December 31st.  N.J. Stat. §§34: 15-94 and 34: 15-120.1 (for the UEF, the surcharge is 150% of the money estimated to be payable).  At least these two funds are the SPFs at issue in this action, although other SPFs may also be implicated.

56.    Insurers writing WC policies in New Jersey are required to file annual financial statements with the Commissioner of Banking and Insurance ("CBI") that include a report of the aggregate amount of premium that each insurer collected during the preceding calendar year from policyholders who purchased WC coverage in New Jersey.  The NJCOL calculates the

amount it needs to fund their Special Purpose Fund programs, and then determines these annual assessments in part based on the total amount of WC insurance premium that insurers report having collected from New Jersey policyholders in the preceding calendar year. The NJCOL determines how much it needs to fund the SPFs in the coming year; divides this amount by the aggregate of net direct written premium that the insurers reported collecting, as shown in the insurers' annual financial statements on file with the New Jersey Department of Insurance; and then, based on this formulation, instructs insurers to assess each policyholder a uniform percentage surcharge based on the policyholder's premium.

57.    Commencing in approximately 1970 and continuing for approximately the next 40 years, Defendants annually underreported the amount of WC premium they collected in New Jersey in the preceding calendar year. By reporting a lower amount of WC premium than they actually had written, Defendants caused insurance regulators to perceive and to believe that the total amount of WC insurance premium that all WC insurers had collected was far less than it actually was. Thus having an apparently smaller pool of money to draw from, the NJCOL, on behalf of the SIF and the UEF, instituted higher percentage surcharges to be levied on policyholders to fund the Special Purpose Fund programs than they would have charged had they known the correct total amount of premium that had been collected.

58.    Pursuant to state laws and relevant regulations, as well as industry custom, the insurers, including Defendants, then collected the full cost of these assessments from their policyholders in the form of state-mandated surcharges billed to the policyholders.

59.    Defendants knew this was occurring at the time it occurred, because Defendants knew how the NJCOL calculated the SPF assessments; knew the requirements of the laws mandating pass-through of these costs to policyholders; and knew that they could, and did, profit from the difference between the aggregate amount of SPF assessments they collected from WC policyholders and the lesser amount of SPF assessments that they remitted to the state. Defendants never disclosed that these overcharges were occurring.

60.    Each of the SPFs described herein existed for all or a substantial part of the

approximate four decades of underreporting. Further, each time these agencies levied any of these assessments, the surcharged percentages were improperly and uniformly inflated by Defendants' underreporting.

61.   The validity of WC insurance surcharges and premiums billed to the insured employers doing business in New Jersey has at all relevant times depended on the honest and truthful and lawful and accurate reporting by insurers of the WC insurance premium they collect. This number is an essential part of the calculations that the NJCOL makes to determine how much to assess policyholders in the form of SIF and UEF surcharges.

*Second Injury Fund ("SIF")*

62.   The SIF was created in 1923 for the purpose of making benefit payments to workers already partially disabled who subsequently experience a work related injury, which together, render them totally disabled.   All WC policies issued in New Jersey and incepting on or after 1988, include a surcharge for this Fund. Once the amount necessary to cover claims is determined, the NJCOL approves an aggregate amount of assessment and allocates it between self-insured employers and insured employers in proportion to payroll respectively paid in the most recent year for which payroll information is available. N.J. Stat. § 34: 15-94. The assessment is then paid by self-insurers based on a percentage of indemnity paid during the most recent year for which information is available and by insured employers, including Plaintiff and the Class, as a percentage of premium in the same manner as alleged above. This surcharge appears on policyholders' bills as "Second Injury Fund Surcharge." The same charge is sometimes described by other names.

62.   New Jersey imposed the SIF surcharge on policyholders who purchased WC policies in this State during years when AIG was fraudulently underreporting its share of the premium it collected in the State of New Jersey, with the effect of inflating the amount of the SIF surcharge that each policyholder paid since 1988 at the latest.  As a result, policyholders, including Plaintiff and the Class suffered direct injury by reason of Defendants fraud.

*Uninsured Employers Fund ("UEF")*

63.    The UEF was created in 1967 to provide for temporary disability benefits and medical expenses to workers suffering from compensable injuries while working for employers who fail to provide the required workers' compensation insurance coverage and who fail to make such benefit payments as awarded by the Division of Workers' Compensation. All WC policies issued in New Jersey and incepting on or after 1988, include a surcharge for the UEF. The NJCOL approves an aggregate amount of assessment and allocates it between self-insured employers and insured employers (in proportion to premium paid) respectively paid in the most recent year for which payroll information is available. N.J. Stat. § 34: 15-120.1. The assessment is then paid by self-insurers based on a percentage of indemnity paid during the most recent year for which information is available and by insured employers, including Plaintiff and the Class, as a percentage of premium in the same manner as alleged above with respect to the other surcharges. This surcharge appears on policyholders' bills as "Uninsured Employers Benefits Trust Fund Surcharge." The same charge is sometimes described by other names.

64.    New Jersey imposed the UEF surcharge on policyholders who purchased WC policies in this State during years when AIG was fraudulently underreporting its share of the premium it collected in the State of New Jersey, with the effect of inflating the amount of the UEF surcharge that each policyholder paid since 1988. As a result, policyholders, including Plaintiff and the Class suffered direct injury by reason of Defendants fraud.

**DEFENDANTS KNEW THAT THEIR CONDUCT WAS ILLEGAL**

65.    Defendants were well aware that their conduct was illegal. Indeed, when executives and even AIG's General Counsel learned of the conduct and challenged it, Defendants repeatedly determined to conceal the illegal conduct and continue to engage in the illegal conduct.

66.    According to the New York Attorney General, in June 1989, a compliance and underwriting administration officer for the Risk Management Division of AIG met with the head of AIG-RMI and recommended that certain of  AIG's false reporting programs

immediately be stopped. His superior responded that none of his presentation was news to him. Indeed, he had made a similar presentation (using stronger language) to his superiors some time earlier, but AIG had decided to continue the illicit practices until it could work out, and implement, an alternative scheme to avoid some substantial part of the taxes and assigned risk assessments on its WC business.

67.     In 1991 and 1992, when the fraudulent schemes had been in place for some two decades, E. Michael Joye, who was then General Counsel of AIG, conducted an internal investigation, which concluded with a formal, written report (the "Joye Memorandum") that acknowledged and detailed the company's unlawful conduct.

68.     As detailed in the Joye Memorandum, Defendants' conduct in connection with the WC market involved "major elements of illegality", which included: (1) false reporting of WC premium as general liability premium, so as to avoid premium taxes, residual market obligations, and other WC related assessments and expenses, (2) booking fictitious premium and assets, (3) overcharging clients, (4) exceeding maximum legal WC premium, (5) violating SEC regulations, (6) giving illegal rebates to clients, and (7) using unfiled, unapproved WC contracts that would not qualify for regulatory approval in most states.

69.     The Joye Memorandum concluded that:

> A jury could find that the above conduct constitutes various kinds
> of State and Federal civil and criminal violations, including
> common law fraud, mail fraud, Securities Act violations, RICO
> violations, State statutory and regulatory violations, State tax fraud
> and breach of contract. In addition, this conduct would be a
> violation of the proposed new Federal insurance fraud statute if it
> becomes law in early 1992 as expected. The RICO statute, in
> addition to stringent criminal penalties, provides a treble damages
> civil action to private plaintiffs. *Potential plaintiffs who could take*
> *advantage of this and other causes of action are the other*

> *insurance companies who have to pick up AIG's share of residual market assessments and other assessments, the States who lose premium tax payments to which they are legally entitled and AIG's insureds who pay for residual market assessments and premium taxes that AIG does not report or pay.* Also possible are class actions by such plaintiffs seeking bad faith and punitive damages. If successful, such class actions would result in astronomical damages awards against AIG.

70.    Specifically, the misconduct identified in the Joye Memorandum, and later admitted by AIG, includes the following:

(a)    Defendants falsely reported a substantial portion of their WC premium as general liability premium, in violation of laws that require insurers to accurately report the premium they collect by line of business.

(b)    AIG created and implemented an "18-Month Close-Out Program," pursuant to which WC premium collected more than 18 months after policy inception was booked as general liability premium. Under the "18-Month Close-Out Program," the AIG Companies purported to terminate WC policies at the first adjustment point, which occurred 18 months after policy inception. Defendants then calculated the refund of WC premium that would be due to the insured if the policy had in fact been terminated and recorded that amount in their books as having been paid to the insured, when in fact no cash was paid. At the same time, Defendants recorded on company books an amount equal to the WC refund as paid to Defendants for a "Stop-Gap Liability Policy," which was then reported as general liability premium. Further premium generated by the WC policies, which the books showed as having been terminated at the 18-month point, also was reported as general liability premium.

(c)    AIG instituted a practice of taking down $25 million each quarter of the expected WC retrospective premium and recording it as premium income on an accrual basis. Defendants booked this premium as reinsurance assumed premium instead of WC premium, in violation of state statutes and regulations which require that premium be reported by line of business. This method allowed Defendants to further avoid payment of state premium taxes, residual market assessments, and other fees and assessments that apply to written direct WC premium but do not apply to reinsurance premium.

(d)    The reporting of fictitious premium and assets on Form 10-K and 10-Q filings that AIG made to the U.S. Securities and Exchange Commission constituted false reports to the SEC, in violation of federal law.

71.    In the course of the internal Joye investigation, if not before, AIG and Greenberg learned that their conduct with respect to booking and reporting WC premium "involve[d] various intentional violations of State and Federal law and that their WC business was "permeated with illegality." Interviews conducted during AIG's internal investigation revealed further admissions that Defendants engaged in widespread and long running false premium reporting practices, with full knowledge and direction of management, including Greenberg and Other Senior Managers. According to the New York Attorney General, one employee stated that AIG Chairman Greenberg "knows the whole program" and "wants it this way." Another employee stated: "You should be aware that [Greenberg] knows about this and has approved it." And a third employee stated that the false reporting schemes had been reported to AIG's senior management and that Greenberg did not want to change things to "make it legal – he wants to continue as is."

72.    Greenberg and others, including Other Senior Managers, knew and approved of the false reporting schemes and failed to take corrective action in the form of payment of additional taxes and assessments, despite Joye's discovery and unequivocal identification of

their illegality and the need for corrective action. AIG and Greenberg were advised that the false reporting practices were illegal and should be halted, that corrective action needed to be taken, and that restitution had to be made to victims. Defendants ignored this advice, continued the false reporting of premiums, continued to falsify sworn financials, and continued to intentionally benefit from the financial gains created by the false reporting.

**DEFENDANTS CONCEALED THEIR WRONGDOING**

73. For approximately 20 years following issuance of the Joye Memorandum, Defendants took steps to hide their wrongdoing and the true nature and full extent of the harm they caused through their false WC premium reporting practices.

74. Despite dissemination of the Joye Memorandum to AIG executives who had the authority and the responsibility to assure that the AIG Companies followed all applicable laws, Defendants, along with unnamed officers and managing agents who were privy to the internal investigation, failed to end the false WC premium reporting, failed to correct the false certified financial statements, failed to disclose their misconduct and its adverse consequences, and failed to make restitution to all those injured by Defendants' fraudulent misconduct. Instead, Defendants fraudulently concealed the Joye Memorandum and did not follow the advice of its then-General Counsel to immediately stop and remediate the harm caused by their criminally and civilly fraudulent acts.

75. Defendants failed to take proper and lawfully required action to preserve evidence of the false premium reporting misconduct. Instead, Defendants embarked on a cover-up that included the destruction of relevant records, as set forth in greater detail below.

76. AIG and Greenberg disregarded Joye's recommendation that specific "corrective actions" be taken. In particular, they rejected Joye's express direction that leadership, including Greenberg and the Other Senior Managers, should immediately end the illegal conduct, discharge the employees involved, pay restitution to victims, and adopt appropriate compliance measures. AIG repeatedly was advised by several of its executives that the misreporting of WC premium as reinsurance-assumed premium was fraudulent and in need of correction. Reports

addressing the fraudulent nature of AIG Companies' premium reporting and business practices were ignored, not retained, concealed, or destroyed by AIG, Greenberg and those acting at their direction, for the purpose and with the effect of concealing the fraud.

77.   Despite repeated internal objections to and notice of the ongoing illegality, Defendants failed to preserve records and other evidence of the misconduct and/or actively and affirmatively destroyed records and other evidence of the misdeeds, in violation of their document retention policies and in violation of their legal and ethical duty to preserve such records and other evidence, including, but not limited to their duty to preserve such records and evidence once they were on notice of the threat of potential litigation. By allowing relevant information concerning the false reporting practices to be destroyed or lost, Defendants, as well as their responsible company officers and employees, acted contrary to legal and corporate requirements pertaining to the preservation of information and evidence.

78.   Furthermore, despite the clear and intentional injury caused by the admitted false reporting conduct, neither AIG nor Greenberg took any disciplinary action against any of the responsible individuals who had been identified.

79.   After Tizzio advised Joye that AIG and Greenberg were not going to follow his recommendations, Joye resigned as AIG's General Counsel. In his letter of resignation, which his predecessor Waylon Mead later told him would be destroyed by AIG, Joye stated that he could not remain as AIG's top legal officer since AIG refused to implement the corrective actions that he had recommended.

**AIG'S MISCONDUCT COMES TO LIGHT**

80.   The Joye Memorandum did not come to light until approximately 2005 or 2006. Until that time, Defendants' underreporting scheme and all of the facts about AIG's conduct and the directives from Greenberg and the Other Senior Managers were known only to Defendants. In 2005 and 2006, federal and New York state authorities launched investigations into the accounting, financial reporting, and insurance brokerage practices of AIG, during which investigations the Joye Memorandum was first uncovered as part of the New York Attorney

General's efforts.

81.    Ultimately, AIG and various enforcement authorities reached settlements in 2006. As part of the settlements, AIG admitted its false premium reporting and professed to adopt appropriate financial reporting, corporate governance, and ethical and lawful codes of conduct. Some of the Other Senior Managers who had directed the misconduct resigned. AIG also made payments or placed into escrow a total of $1.64 billion to resolve the above-described investigations. Two hundred and twenty-five million dollars of this money represented payment of fines and penalties, while $330 million of the funds were escrowed for settlement of claims resulting from the underpayment by AIG of its residual market assessments.

82.    In 2007, the National Council on Compensation Insurance, Inc. ("NCCI"), on behalf of the participating companies in the National Workers' Compensation Reinsurance Pool ("NWCRP"), filed suit against Defendants in the U.S. District Court for the Northern District of Illinois, alleging that they were injured to the extent that Defendants' underreporting caused these non-AIG insurers to incur a disproportionate share of the losses and assessments associated with the assigned-risk pool in states that participated in the NWCRP. (New Jersey is not a member of the NWCRP.)  In 2009, the Court dismissed that lawsuit for lack of standing, and individual insurer members of the NWCRP thereafter brought a class action lawsuit seeking to recover losses suffered by the non-AIG members of the NWCRP, which the plaintiff insurers estimated to be "hundreds of millions of dollars in direct damage … as well as the loss of the use of funds and other consequential damages in excess of $1 billion." *Safeco Ins. Co. v. American Int'l Group, Inc.,* 09CV02026 (N.D. Ill.). In December 2011, the court in *Safeco* granted final approval of a $450 million settlement, over objections by intervenor and counterclaimant Liberty Mutual, which argued that the settlement was inadequate in part because it required release of all claims without awarding anything for the damages caused by AIG's underreporting of state-levied Fund assessments or residual market assessments in states that have independent residual market mechanisms outside the NWCRP. In March 2013, AIG reached a settlement with Liberty Mutual to resolve its objection and appeal.

**PLAINTIFF DID NOT KNOW, AND COULD NOT HAVE KNOWN, OF
DEFENDANTS' FRAUD**

83.    As set forth above, Defendants' fraudulent misconduct involved numerous
sophisticated schemes, spanned approximately four decades, and involved misreporting to state
insurance departments throughout the country, as well as to shareholders, policyholders, and the
SEC. Neither Plaintiff nor the Class Members knew, nor reasonably could be expected to have
known, of Defendants' fraud nor of the fact that this fraud impacted them, for a number of
reasons.

84.    First, Plaintiff and the Class did not have information leading them to believe that
Defendants' scheme existed or harmed them. For a period of decades, the only people who
knew of Defendants' scheme were Defendants and their conspirators. Defendants affirmatively
acted to hide their unlawful conduct from Plaintiff and the Class. Defendants' false reporting
began in approximately 1970 and Defendants knew of the illegality of these practices from
inception. But rather than disclosing the truth about these practices and about their impact on
Plaintiff and the Class, Defendants continue to this day to take steps to hide their misconduct
and the harm it has caused, through fraudulent concealment, destruction of relevant records,
and/or failure to disclose facts relating to their misconduct.

85.    To the extent that information about Defendants' scheme was uncovered during
the course of state and/or federal investigations, none of these investigations nor the publicly-
available information emanating from same, and none of the resulting settlement terms or
provisions, alerted nor reasonably could have alerted Plaintiff or Class Members to the fact that
they were damaged in the form of wrongfully inflated surcharges based on Defendants'
underreporting.

86.    While the Joye Memorandum details a list of potential complainants, it notably
does not raise the possibility that Plaintiff and the Class paid inflated Special Purpose Fund
surcharges in New Jersey in connection with their workers' compensation insurance covering
their New Jersey employees. On the contrary, it asserts that through a "residual market

loading," or "RML," AIG overcharged its clients for residual market assessments that it never paid, and that it overcharged its clients for state premium taxes it never paid. But it does not say that AIG's insureds paid anything extra for Special Purpose Fund assessments and it says nothing about the effects that AIG's scheme had on the insureds of Other Insurers. With respect to "Guaranty Funds and Special Purpose Funds," the Joye Memorandum reports that AIG's false reporting of WC premium allowed it to pay "substantially lower assessments," and that the amount it avoided paying was "paid as additional assessments by the other insurance companies subject to Guaranty Fund and Special Purpose Fund assessments." But nowhere is it explained that these assessments were passed through to policyholders, and, indeed, in many states they are not. Therefore, even if Class Members had access to the New York Attorney General's 2005 Complaint and/or the Joye Memorandum that was made public as a part of that action, these documents did not apprise Plaintiff nor the Class of the fact that they were injured by AIG's misconduct, nor could they reasonably have afforded Plaintiff nor the Class notice of same. Nor was there any money set aside in the settlement of that action to indemnify policyholders for these losses, nor have either of the Plaintiff nor any Class Members received any compensation from any settlement to date to remedy their losses incurred as a result of the inflated SPF surcharges levied against them in New Jersey as a result of Defendants' WC premium underreporting.

87.   To the extent that Other Insurers learned of Defendants' illegal practices in connection with these investigations, none of these entities disclosed to Plaintiff what they knew about the misconduct and its effects on Plaintiff and the Class. Certain Other Insurers took action against AIG in the form of the *Safeco* litigation described above. However, nowhere in any of the court filings from that case is there information that is or was reasonably accessible to Plaintiff and the Class that would have led Plaintiff or the Class to believe that they were injured by Defendants' conduct. In fact, the claims asserted by Other Insurers seeking their own damages further disguise the harm to policyholders and mislead the general public from understanding that in New Jersey, the policyholders paid the unlawfully inflated Special

Purpose Fund surcharges. Plaintiff was not a member of any class represented in the *Safeco* litigation and did not receive any court-mandated notice of that proposed settlement. Moreover, the *Safeco* litigation involved other insurers in assigned-risk-pool states, which New Jersey is not. Thus, no New Jersey class member learned nor could have learned from the *Safeco* litigation of any injury that it may have suffered as a result of Defendants' fraudulent underreporting scheme

88.     Second, Plaintiff and the other Class Members did not have the necessary expertise in the intricacies of WC regulatory requirements and filings, and the complex manner in which state assessments are calculated, to discover their injury. Defendants and Other Insurers had vastly superior knowledge of the various states' insurance laws, and Plaintiff and the other Class Members reasonably relied on the peculiar expertise and knowledge of the WC insurance industry, and of state insurance regulators, with respect to such matters. Defendants had contractual and fiduciary obligations to their policyholders to inform them of the unduly high surcharges if and when they learned about them, and to indemnify Plaintiff and the Class for these losses, yet Defendants to date have not informed any of their policyholders about the losses sustained by Plaintiff and the Class.

89.     Although they had a duty to disclose the true facts, Defendants have never informed their policyholders, either of the Plaintiff, nor any other Class Member, that AIG's misconduct harmed them in any way. To this day, substantially all Class Members remain unaware of the injury caused them by Defendants' misconduct.

90.     Third, AIG has never provided an accurate accounting of the WC premium it actually collected annually for each year since the 1970s.

91.     Based on AIG's admissions and on estimates from actuarial experts and economists during the course of the investigations and lawsuits, the harm to New Jersey policyholders, as alleged herein, is on the order of at least tens of millions of dollars over the course of the relevant time period. Indeed, Joye estimated in 1992 that the amount of AIG Companies' workers compensation premium that went unreported nationwide was in the range

of $300-400 million or more annually, at then-current levels of business. Yet no money has been allocated for restitution to the insured employers for these losses, nor has the effect of AIG's misconduct on insured employers in the State of New Jersey ever been publicly acknowledged.

92.     According to sworn filings made in the *Safeco* litigation in late 2011, evidence generated in that litigation revealed that AIG had underreported WC premium during time periods outside those periods as to which AIG has previously admitted the misconduct and in AIG divisions other than those specifically described in the Joye Memorandum. That evidence remains under seal and neither Plaintiff nor Class Members have had access to that information.

93.     Although the Joye Memorandum became public in 2005 or 2006, and although certain federal and state authorities investigated Defendants' misconduct, as recently as 2007 AIG's chief underwriting officer raised concerns that AIG might still be continuing to underreport WC premium. According to sworn filings made in the *Safeco* litigation in late 2011, AIG's Deputy General Counsel reported this concern to AIG's outside auditor in 2007, after the conclusion of the New York Attorney General's investigation and after the time period during which AIG had previously admitted underreporting. Evidence relating to this remains under seal and neither Plaintiff nor Class Members have had access to that information.

94.     Thus, though at all times Plaintiff and the Class exercised reasonable diligence with respect to the matters herein alleged, neither Plaintiff nor other Class Members discovered, nor reasonably could have discovered, their injury without consulting with attorneys and other experts who suspected Defendants of their wrongdoing. This did not occur until 2013.

**THE CONSPIRACY**

95.     At all relevant times, AIG, Greenberg and the Other Senior Managers controlled the AIG Companies. AIG, Greenberg, and the Other Senior Managers caused the AIG Companies to engage in the wrongdoing alleged herein. AIG, Greenberg, and the Other Senior Managers agreed and conspired with each other to carry out the scheme alleged in this complaint and aided and abetted that scheme.

96.   At all times material to this Complaint, each Defendant and each Other Senior Manager was the agent, servant, representative, officer, director, partner, or employee of the other Defendants; and, in perpetrating the underreporting scheme as herein alleged, each of them acted in furtherance of the common conspiracy, with the knowledge and consent of AIG and Greenberg, and with the intent and effect as described herein.

97.   Defendant AIG Companies all utilized underwriting services of the same underwriter, AIG-RMI, which helped prevent the fraudulent underreporting from being discovered earlier than it was.

### FACTS PERTAINING TO RICO CLAIMS

98.   At all times material to this Complaint, the AIG Companies, the Other Senior Managers, CVSCO and SICO collectively constituted an association-in-fact "enterprise," as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), involving widespread underreporting of WC insurance premium by AIG Companies in New Jersey and throughout the United States over an approximate 40-year period. This enterprise had a common purpose, namely, to carry out the underreporting scheme described in this Complaint.

99.   At all times material to this Complaint, each AIG Company was an "enterprise" within the meaning of RICO.

100.  At all times material to this Complaint, AIG was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

101.  At all times material to this Complaint, Greenberg was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

102.  At all times material to this Complaint, AIG and Greenberg conducted, and conspired to conduct, the affairs of each of the AIG Companies, CVSCO, and SICO, through a pattern of racketeering activity.

103.  AIG, Greenberg, and the Other Senior Managers directed, controlled, and participated in the operation and management of the AIG Companies and each of them, and directed, controlled, and participated in the operation and management of SVCO and SICO.

104.  Each of AIG, Greenberg, and the Other Senior Managers had a distinct role and performed a distinct function in perpetrating the fraudulent underreporting schemes, which included directing each of the AIG Companies to undertake numerous acts of mail and/or wire fraud, as described herein; and each received proceeds and/or benefits that were separate and distinct from the proceeds and/or benefits received as a result of each individual act of mail fraud by each of the AIG Companies.

105.  AIG and those persons who conducted its global business operations, including but not limited to Greenberg and the Other Senior Managers, participated in the conduct and operation of the underreporting scheme by the AIG Companies by numerous means, including: devising the nature and mechanics of the false reporting, false booking, and mischaracterizing of WC premium; consciously deciding to direct and directing AIG corporate subsidiary forms (including AIG Companies and others) to undertake fraudulent acts that insulated AIG, Greenberg, and the Other Senior Managers from regulatory enforcement and other liabilities; and directing AIG Companies, their employees, and lower level employees of AIG and other affiliated entities to: (i) disperse the proceeds of the wrongful and unlawful conduct, and (ii) conceal the nature and extent of the lies and wrongdoing. AIG, Greenberg, and the Other Senior Managers directed the AIG Companies in this manner, expecting and intending that Plaintiff and the Class would be injured by reason of the underreporting fraud. They did so in order to wrongfully enrich themselves over an extended period of time.

106.  Through the association-in-fact enterprise, AIG and Greenberg, acting through AIG officers, employees and agents who exercised influence and control over the business operations of CVSCO and SICO, including Greenberg and the Other Senior Managers, caused CVSCO and SICO to transfer valuable assets owned by those companies to the managers, employees and other agents of the AIG Companies who conceived of or implemented the WC underreporting scheme, and to the managers, employees and other agents of the AIG Companies who had knowledge of the WC underreporting scheme and who therefore were in a position to disclose that scheme to the authorities or the public.  These asset transfers were

transacted without any corresponding transfer of consideration to CVSCO and SICO, in order to reward managers, employees and other agents of the AIG Companies for contributing to the AIG profitability, without regard to whether this was achieved by unlawful means, including by racketeering activity. Because the assets transferred by CVSCO and SICO to managers, employees and other agents of the AIG Companies were extremely valuable, the recipients of these transfers were strongly incentivized to contribute materially to high levels of profitability growth (as reported publicly by AIG) even if (i) unlawful means, such as racketeering activity, were required to make such contributions, and (ii) concealment of the use of such unlawful means were required to continue to make such contributions.  Furthermore, because AIG was a publicly owned company, but CVSCO and SICO were not, by rewarding officers, employees and other agents of Defendants for contributing to AIG's publicly reported profitability growth by means of asset transfers from CVSCO and SICO, instead of from AIG directly, AIG was able to avoid the public disclosures that would have been required if these asset transfers had been effected directly by AIG or by the AIG Companies. AIG thereby also avoided the regulatory and public scrutiny that would have accompanied such disclosures had the extent and value of these asset transfers to the officers, employees and other agents of Defendants who conceived of, implemented and/or had knowledge of the AIG WC underreporting scheme, been known to the authorities and to the public.

107. The purpose of the association-in-fact enterprise was thus to corrupt those managers, employees and other agents of the AIG Companies who conceived, implemented, participated in or otherwise had knowledge of the WC underreporting scheme through the undisclosed payment of excessive incentive compensation, thereby enabling the AIG Companies, acting at the direction of AIG and through the individuals who conducted their business operations, to implement those schemes over decades to maximize the reported profitability of AIG and defraud the Plaintiff Class.

108. At all times material to this Complaint, AIG, Greenberg, and the Other Senior Managers, and each of them, operated, managed, and directed the underreporting scheme,

including repeatedly and continuously engaging in a pattern of racketeering activity and directing AIG Companies to undertake numerous specific racketeering acts. As part of this common plan, AIG, Greenberg, and each of the Other Senior Managers, individually and collectively, caused each of the AIG Companies to perform all of the following acts, among others:

    (a)    to send to and file with the CDI false financial statements that underreported the true amount of WC premium written in New Jersey by the AIG Companies;

    (b)    to send to and file with the WCIRB false financial statements that underreported the true amount of WC premium written in New Jersey by the AIG Companies;

    (c)    to send to DIR, CDI, and CIGA monies that purported to satisfy AIG Companies' obligations to DIR, CDI, and CIGA but which underpaid AIG Companies' obligations to DIR, CDI, and CIGA owed for Special Purpose Fund assessments;

    (d)    to send to their own policyholders billing statements that included false and fraudulent surcharges; and

    (e)    to make publicly misleading and false statements to conceal their false reporting scheme from the authorities, from their competitors, and from the public, including to shareholders in their annual and other reports, to journalists who reported on AIG, to financial analysts who covered AIG, and to businesses that employed New Jersey workers and who purchased WC insurance in New Jersey.

109.   AIG, Greenberg, and the Other Senior Managers: (1) conducted and participated in the conduct of the affairs of the AIG Companies and each of them through multiple predicate crimes of mail fraud and/or wire fraud in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud); (2) aided and abetted violations by others of these laws, within the

meaning of 18 U.S.C. § 2; and (3) used the mails to deliver and disseminate false responses to financial data calls, false statistical reports, falsely sworn financial statements and other reports, agreements, correspondence, policy materials, premium reports and notices, payments of tax obligations and Special Purpose Fund assessments, reports to insurance regulators, reports to other government agencies, and notices to policyholders and other insurers, for the purpose of an unlawful scheme to obtain money by false misrepresentations, all in violation of the mail fraud statute.

110. Materials transmitted by mail and/or by wire that contained knowing and intentional misrepresentations and omissions that were intended to deceive included, among others:

> (a) Annual false certifications and reports concerning the true and correct amount of WC premium collected by the AIG Companies in New Jersey, as well as in other states across the nation, including in documents mailed to insurance regulators, ratings bureaus and advisory organizations;
>
> (b) Fraudulent and undisclosed agreements used to further the overall fraud and schemes to falsely report, mischaracterize, and understate WC premiums;
>
> (c) Payments of assessments to the State that were inaccurately low; and
>
> (d) Policyholder billing statements containing inaccurate, inflated surcharges that resulted in substantial overcharges to policyholders.

111. Defendants' racketeering activity was frequent and continuous, beginning in approximately 1970 and continuing for approximately forty years. Each successive mail and/or wire fraud was related to the overall scheme to defraud Plaintiff and the Class, among others. Defendants' acts constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

112. Plaintiff and the Class Members have been directly injured in their business and their property by reason of Defendants' racketeering activity.

113. This pattern of racketeering activity consisted of the following specific acts, among others:

114. *Racketeering Act One: mailing of fraudulent annual financial statement to Commissioner of Banking and Insurance ("CBI"):* On or about July 31, 1989, each of the AIG Companies other than American Fuji Fire and Marine Insurance Company, in furtherance of the underreporting scheme, knowingly mailed or caused to be mailed to the CBI an Annual Statement that falsely represented the amount of annual net direct WC premium that the company had collected during the 1988 calendar year. This financial statement was verified under oath by one or more of the respective AIG Companies' executive officers. The mailing of this document violated 18 U.S.C. §§ 1341 and 2, and was an integral part of the scheme that damaged Plaintiff and the Class as alleged herein.

115. *Racketeering Act Two: mailing of fraudulent annual financial statement to CBI:* On or about July 31, 1994, each of the AIG Companies, in furtherance of the underreporting scheme, knowingly mailed or caused to be mailed to the CBI an Annual Statement that falsely represented the amount of annual net direct WC premium that the company had collected during the 1993 calendar year. This financial statement was verified under oath by one or more of the respective AIG Companies' executive officers. The mailing of this document violated 18 U.S.C. §§ 1341 and 2, and was an integral part of the scheme that damaged Plaintiff and the Class as alleged herein.

116. *Racketeering Act Three: mailing of fraudulent annual financial statement to CBI:* On or about July 31, 1999, each of the AIG Companies, in furtherance of the underreporting scheme, knowingly mailed or caused to be mailed to the CBI an Annual Statement that falsely represented the amount of annual net direct WC premium that the company had collected during the 1998 calendar year. This financial statement was verified under oath by one or more of the respective AIG Companies' executive officers. The mailing of this document violated 18 U.S.C. §§ 1341 and 2, and was an integral part of the scheme that damaged Plaintiff and the Class as alleged herein.

117.   *Racketeering Act Four: mailing of fraudulent annual financial statement to CBI:* On or about July 31, 2004, each of the AIG Companies, in furtherance of the underreporting scheme, knowingly mailed or caused to be mailed to the CBI an Annual Statement that falsely represented the amount of annual net direct WC premium that the company had collected during the 12003 calendar year. This financial statement was verified under oath by one or more of the respective AIG Companies' executive officers. The mailing of this document violated 18 U.S.C. §§ 1341 and 2, and was an integral part of the scheme that damaged Plaintiff and the Class as alleged herein.

118.   Each of the racketeering acts committed by or at the direction of AIG, Greenberg, and the Other Senior Managers was related, had the same or similar purpose of executing the scheme and unlawful conduct alleged herein, involved the same or similar participants and method of commission, had similar results, and directly impacted similar victims, including Plaintiff and the Class.

119.   To effectuate the illegal scheme, AIG, Greenberg, and the Other Senior Managers also used and caused the use of mails in interstate commerce to deliver insurance billing statements to policyholders that contained surcharges that had been calculated on the basis of, and thereby incorporated, AIG's and AIG Companies' false statements regarding WC premium. AIG, Greenberg, and each of the Other Senior Managers also sent and received agreements, communications, and correspondence through the mails and received ill-gotten payments through mail and/or wire. Each such act furthered the scheme and injured Plaintiff and the Class as alleged herein.

120.   The repeated acts of mail and wire fraud described above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§1961(1) and 1961(5).

121.   Defendants' racketeering activities affected interstate commerce. AIG is one of the largest providers of WC insurance in the U.S., offering a nationwide network of underwriting and program design services, claims operations, and loss control services to business of virtually any size in virtually every industry in the national market. The

underreporting scheme was a nationwide scheme. At the same time that they were directing the AIG Companies to perpetrate the underreporting scheme in New Jersey, they were also directing these and other AIG Companies to perpetrate the same scheme in numerous other states. In addition, many of the Class Members did business across state lines, so the losses they incurred as a result of the decades of inflated overcharges that they paid in New Jersey affected the class members' ability to compete generally by causing them to incur additional costs of doing business that they should not have been required to expend.

## REPRESENTATIVE PLAINTIFF'S FACTUAL ALLEGATIONS

### PLAINTIFF JPS COLLISION, INC.

122. Between approximately 1999 and the present, Plaintiff JPS Collision has employed between 6 and 15 employees at its automotive repair facility in Newark, New Jersey.

123. During this timeframe, JPS Collision paid for WC insurance coverage in the State of New Jersey each and every year.  At various times, JPS Collision has paid for WC insurance coverage from insurers including Travelers, Harleysville, American Hardware, and Federated Mutual Insurance.

124. JPS Collision typically has paid between $2,000 and $15,000 in WC insurance premium per year.

125. In addition, during this timeframe, each time that the State of New Jersey assessed any and all SPF surcharges on New Jersey policyholders, JPS Collision has paid the same.

126. In paying the monies described above, JPS Collision relied on SPF charges shown on the statements it received from its insurers.  JPS Collision's insurers relied on state regulators to set SPF assessments to be billed to JPS Collision at the instruction of state regulators; JPS Collision's insurers also relied on state regulators to accurately determine the assessments made on the insurers, for which they then billed JPS Collision.

127. In setting SPF assessments, state regulators relied on Defendants' reporting of WC insurance premium written in the State of New Jersey.

128. Because Defendants underreported WC insurance premium written in the State as

36

described in this Complaint, JPS Collision paid improperly inflated Special Purpose Fund assessments and was injured thereby.

129.  JPS Collision was injured in its business or property as a direct result of Defendants' scheme.

130.  At no time before approximately August 2013, when JPS Collision was informed of same during the course of investigation by its counsel herein, was JPS Collision aware of the existence of Defendants' scheme, of Defendants' underreporting of WC insurance premium in the State (or elsewhere) generally, of any impact that Defendants' underreporting of WC insurance premium had or could have on Plaintiff or the Class, or of its own injury. Defendants' scheme and conduct, and the injuries resulting to JPS Collision, were and are so arcane that JPS Collision did not become aware of same until well within three years prior to the filing of this suit.  Nor, for the reasons described above, could JPS Collision reasonably have become aware of same at an earlier time.

<strong>CLASS ACTION ALLEGATIONS</strong>

131.  Plaintiff brings this action individually and on behalf of a class of similarly situated employers. The Class is initially defined as follows:

> All persons and/or entities who purchased WC insurance covering
>
> employees in the State of New Jersey since 1970.

132.  If necessary, Plaintiff will move to certify sub-classes for (a) persons who purchased WC insurance covering employees in the State of New Jersey from any Other Insurer and (b) persons who purchased WC insurance covering employees in the State of New Jersey from any AIG Company.

133.  Excluded from the above class(es) are Defendants, any entities in which Defendants have a controlling interest, and officers or directors of Defendants. Plaintiff reserves the right to modify the class definitions and the class period based on the results of discovery and/or rulings of the Court.

134.  Because the misconduct occurred over a period of time that lasted many decades,

Plaintiff and other Class Members purchased WC insurance policies from various insurers during the relevant time period. Nonetheless, because employers doing business in New Jersey all were affected the same way—in the form of inflated uniform percentages charged to them on the applicable policy billing statements for Special Purpose Fund surcharges—the Class consists of all policyholders, including those insured by AIG Companies. This action is brought as a class action and may properly be so maintained pursuant to the provisions of the Federal Rules of Civil Procedure 23(a) and 23(b).

135.  *Numerosity of Class* - The class consists of all policyholders who purchased WC insurance covering employees in the State of New Jersey since 1970, and thus is so numerous that joinder of all class members would be impracticable. Plaintiff is informed and believes that there are thousands of members of the class. The number and identities of class members can be ascertained through business records regularly maintained by the State, the WCIRB and other insurance-related advisory organizations, Defendants and their employees and agents, Other Insurers and their agents, and through the media. Members of the Class(es) can be notified of the pending action by e-mail, mail, and supplemented by published notice, if necessary.

136.  *Existence and Predominance of Common Questions of Fact and Law* - There are questions of law and fact common to the Class. These questions predominate over any questions affecting only individual class members. These common legal and factual issues include, but are not limited to:

(a)     Whether Defendants had a duty to file accurate annual financial or other statements with the CDI with respect to the volume of WC premium they collected annually

(b)     Whether Defendants underreported to New Jersey regulators the volume of WC premium that they collected from New Jersey policyholders

(c)     Whether Defendants' underreporting caused higher surcharges to be assessed on New Jersey policyholders

(d)     Whether Defendants' underreporting constitutes an unlawful, unfair, or

fraudulent business practice that damaged Plaintiff and the Class

(e)     Whether Defendant defrauded and conspired to defraud, among others, their own policyholders and the policyholders of Other Insurers by using the mail and wires to send (i) false and falsely sworn financial statements that underreported the true amount of WC written in New Jersey by the AIG Companies and other unnamed AIG affiliates; (ii) invoices to their policyholders that included knowingly improper SPF charges; (iii) underpayments to the State of New Jersey of Defendants' obligations for SPF assessments, which falsely purported to satisfy a debt owed to the State of New Jersey while at the same time underfunding the State's SPFs and thereby causing Plaintiff and the Class to overpay the surcharges levied against policyholders to fund these Funds; (iv) false and misleading annual reports and other reports to shareholders, and to various state and federal agencies, which contained misrepresentations about the amount of WC premium collected, SPF assessments and premium taxes owed; etc.

(f)     Whether Defendants obtained and conspired to obtain, through their underreporting of their true proportionate share of the New Jersey WC market annually since approximately 1970, substantial economic benefit from their avoidance of state premium taxes and from their underpayment of SPF assessments collected from policyholders

(g)     Whether AIG violated 18 U.S.C. § 1962(c) and (d)

(h)     Whether Defendants affirmatively misrepresented the true value of the premium they collected to the general public, including Plaintiff and the Class

(i)     Whether Defendants successfully concealed from the public, including Plaintiff and the Class, the harm that their fraudulent scheme caused to policyholders, including Plaintiff and the Class

(j)     Whether Defendants engaged in the alleged misconduct and/or successfully concealed from the public, including Plaintiff and the Class, the harm that their unfair, unlawful, and anticompetitive underreporting of WC premium caused to policyholders

137.   *Typicality* - The claims of the representative Plaintiff are typical of the claims of the members of the Class. The representative Plaintiff and the members of the Class were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Defendants. The representative Plaintiff's individual damages, like the damages of all Class Members, were improperly inflated surcharges.

138.   *Adequacy* - The representative Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel who are experienced and competent trial lawyers in complex and class action litigation. There are no material conflicts between the claims of the representative Plaintiff and the Class Members that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class Members.

139.   *Predominance and Superiority* - This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual class members, while substantial, are small compared to the burden and expense of individual prosecution of the complex and very expensive litigation needed to address Defendants' conduct. Even if class members themselves could afford such individual litigation, the court system would be overwhelmed by the individual lawsuits. In addition, individualized litigation would increase the delay and expense to all parties and to the court system resulting from the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties;

allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

140. Plaintiff anticipates no significant or unusual difficulty in the management of this action because:

      (a)    Defendants' racketeering activities, unfair business practices, and fraud all consisted of the same acts and concealments, without material variation, perpetuated in the same manner on all Class Members, all of whom relied in the same manner on Defendants' misrepresentations to state insurance regulators, rating bureaus, and the general public, as evidenced by their payments of the unlawfully inflated surcharges, which they believed to be lawful and mandatory charges.

      (b)    Defendants have admitted to substantially all of the conduct giving rise to these claims.

      (c)    Evidence proving the relevant facts that Defendants have not admitted to is ascertainable through public records and/or discovery.

      (d)    The identities of the Class Members are known or readily ascertainable.

141. The named Plaintiff contemplate the eventual issuance of notice to the proposed Class Members setting forth the subject and nature of the instant action. Upon information and belief, Defendants' own business records, the business records of Other Insurers, state records, and electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, the named Plaintiff contemplates the use of additional media and/or mailings.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### RICO – VIOLATION OF 18 U.S.C. § 1962(C)

### AGAINST DEFENDANTS AIG AND GREENBERG

142. Plaintiff repeats and re-alleges each and every allegation set forth above in paragraphs 1 through 141 above as if fully set forth herein.

143. AIG and Greenberg violated, and caused the AIG Companies and other members of the association-in-fact enterprise to violate 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud) well over 100 separate and distinct times over an approximately 40-year time period.

144. In performing the acts herein alleged, AIG and Greenberg violated 18 U.S.C. §1962(c) by conducting or participating in, directly or indirectly, the conduct of the affairs of the AIG Companies and the other members of the association-in-fact enterprise, and each of them, through a pattern of racketeering activity.

145. In doing the acts herein alleged, AIG and Greenberg engaged in a pattern of racketeering activity as defined at 18 U.S.C. § 1961(5), by committing at least two acts of racketeering after 1970, the last of which occurred within ten years of a prior act of racketeering activity.

146. AIG's and Greenberg's racketeering affected interstate commerce.

147. Plaintiff and the Class were directly injured in their business or property by reason of AIG's and Greenberg's racketeering activities.

### SECOND CLAIM FOR RELIEF

### RICO – VIOLATION OF 18 U.S.C. § 1962(D)

### AGAINST DEFENDANTS AIG AND GREENBERG

148. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 141 above as if fully set forth herein.

149. AIG and Greenberg agreed and conspired with each other to violate 18 U.S.C.

§1962(c).

150.  AIG and Greenberg agreed that at least two of the predicate acts of mail fraud and/or wire fraud would be committed in furtherance of the underreporting scheme.

151.  The object of the racketeering conspiracy was for AIG and Greenberg to obtain substantial economic benefit in the form of money improperly retained by AIG and the AIG Companies. Defendants gained this benefit by avoiding certain premium tax liabilities, by wrongfully causing the assessment liabilities to be assumed or paid by Plaintiff and the Class, and by failing to remit to the State the full amount of monies collected from their policyholders in the form of SPF surcharges.

152.  It was further the object of the conspiracy that AIG and Greenberg concealed and directed others to conceal from Plaintiff and the Class, and others, the acts undertaken in furtherance of the conspiracy.

153.  It was further the object of the conspiracy to generate profits, compensation, bonuses, and benefits for AIG and Greenberg that they would not otherwise have received.

154.  The foregoing conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

155.  Plaintiff and the Class were directly injured in their business and property by reason of the foregoing conspiracy.

### THIRD CLAIM FOR RELIEF

### COMMON LAW FRAUD –AGAINST ALL DEFENDANTS

156.  Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 141 above as if fully set forth herein.

157.  Beginning in approximately 1970, Defendants carried out schemes to mischaracterize, falsely report, and falsely book the AIG Companies' WC premium as other premium. Specifically, Defendants knowingly and repeatedly, year after year, submitted false statistical reports and false annual statements to the State of New Jersey and, by virtue of the fact that these financial statements were public filings, to the general public, including Plaintiff

and the Class. In these publicly available financial statements, Defendants falsely represented their volume of business in New Jersey by underreporting the amount of WC premium they collected from businesses with New Jersey employees.

158.  The false statements regarding the amount of WC insurance premium that AIG Companies collected in New Jersey were material, in that the NJCOL calculated the amount of annual Special Purpose Fund assessments to be charged to policyholders based on the reported amount of WC insurance premium. The underreporting of premium by Defendants reduced the total premium reported by all insurers, making it appear the NJCOL that these agencies needed to charge higher assessments as a percentage of premium in order to collect the amount of money necessary to operate the Special Purpose Fund programs. These agencies did, in fact, rely on Defendants' false statements in making their calculations, and policyholders were overcharged over an approximate 20-year-period as a result.

159.  AIG Companies furthered this fraud when they repeated in their invoices to their policyholders the falsely inflated assessment rate levied by the relevant New Jersey agencies. Although Defendants truthfully presented what the State was charging for the Special Purpose Fund assessments in a given year, Defendants knew that in reality, these were overcharges, because if they had correctly reported the volume of WC premium they had collected, the assessment rate would have been lower.

160.  When Defendants made these misrepresentations to state agencies, Defendants knew them to be false. And when Defendants informed their policyholders that each of the policyholders owed a particular percentage of its premium to fund the State's Special Purpose Fund programs, Defendants knew that this information also was false.

161.  Defendants made these false and misleading statements with the intent to defraud and deceive Plaintiff and the Class, the general public, the State of New Jersey, and other insurers.  Furthermore, Defendants made these misrepresentations with the intent to induce Plaintiff and the Class to rely on the material misstatements and to pay the overcharges to the State, to the detriment of Plaintiff and the Class.

162. State regulators justifiably relied on Defendants' underreporting as described herein, including in their calculation of assessments to be made on insurers who wrote workers' compensation policies for businesses with New Jersey employees and in their calculations of the SPF assessments to be surcharged to those policyholders.

163. Other Insurers in the state justifiably relied on Defendants' underreporting as described herein and justifiably relied on the assessments made on them by state regulators and on the regulators' instructions to collect a certain amount in surcharges from policyholders for purposes of financing the operating/administrative costs of the state's SPFs.

164. At all times herein relevant, Plaintiff and the other Class Members were ignorant of the falsity of Defendants' representations and believed them to be true and acted in reliance on this belief, to their detriment.

165. Plaintiff and the other Class Members reasonably and justifiably relied on Defendants' false reports and misrepresentations, as communicated to Plaintiff and the other Class Members on their billing statements and in documents that Defendants publicly filed. This reliance was reasonable because Defendants' obligation to accurately report the amount of WC premium that they collected is, and at all relevant times was, statutorily prescribed. Insurers must attest to the truth of these reported numbers under oath, and executives of AIG Companies did so with respect to each annual financial statement filed during the relevant time period. Plaintiff and the Class had no reason to question the validity of the Special Purpose Fund surcharges on their billing statements.

166. Even after information about AIG's fraudulent scheme began to come to light in the course of New York Attorney General investigations into a wide array of alleged misconduct, Plaintiff and the Class still had no reason to suspect that the underreporting had affected them, due to the wide scale and ongoing cover-up that took place and, indeed, still is taking place, as described in greater detail above. The nature of the fraudulent scheme was so complicated, and the effects on insured policyholders so insidious, that Plaintiff and the other Class Members, as end-of-transaction consumers, could not and did not understand that they

had been damaged by virtue of the underreporting scheme.

167. Plaintiff and the Class relied to their detriment on Defendants' intentional misrepresentations about the WC premium that Defendants collected, in that Plaintiff and the Class paid these inflated surcharges year after year, for decades. If Plaintiff and the Class had known the true facts, they would not have paid the inflated Special Purpose Fund surcharges. Plaintiff's reliance on Defendants' misrepresentations was a substantial factor in causing their harm.

168. As a direct and proximate result of Defendants' fraud and deceit and Plaintiff's and the Class Members' reliance thereon, Plaintiff and the other Class Members suffered substantial financial harm in an amount to be proven at trial.

169. The herein-described conduct of Defendants, and each of them, was and is willful, malicious, fraudulent, and outrageous. Furthermore, officers, directors, and managing agents of AIG and each of the AIG Companies participated in, authorized, expressly and impliedly ratified, and had full knowledge of, each of the fraudulent and deceptive acts described herein. Plaintiff and the Class, for the sake of example and by way of punishing Defendants, therefore seek and are entitled to punitive damages in an amount according to proof.

**FOURTH CLAIM FOR RELIEF**

**NEGLIGENT MISREPRESENTATION**

**AGAINST ALL DEFENDANTS**

170. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 141 above as if fully set forth herein.

171. Defendants' underreporting of the amount of WC insurance premium written in the state was a misrepresentation of past or existing material fact.

172. Defendants had no reasonable ground for believing the information they reported to state regulators was true or accurate.

173. Defendants made these misrepresentations with the intent that state regulators would rely thereon in calculating, inter alia, assessments made on insurance companies

46

providing WC insurance in the state and assessments made on policyholders for SPFs.

174.  Defendants made these misrepresentations with the intent that Other Insurers would rely thereon in their participation in the residual market for WC insurance and with the intent that Other Insurers would rely on assessments made on them by state regulators, which state regulators instructed them to collect from policyholders for purposes of operating SPFs.

175.  State regulators justifiably relied on Defendants' underreporting, as described herein, and justifiably relied on the underreporting in calculating assessments on insurers who wrote workers' compensation policies for employers of New Jersey employees and in calculating SPF surcharges to be made on policyholders who bought workers' compensation insurance policies in the state.

176.  Other Insurers in the state justifiably relied on Defendants' underreporting as described herein and justifiably relied on the assessments made on them by the NJCOL, which state regulators instructed them to collect from policyholders for purposes of operating SPFs.

177.  Plaintiff and the Class justifiable relied on Defendants' underreporting, as described herein, in paying inflated SPF surcharges that appeared on their workers' compensation insurance policy premium invoices.

178.  Plaintiff and the Class were damaged in the form of paying inflated assessments for SPFs.

**FIFTH CLAIM FOR RELIEF**

**VIOLATION OF N.J. STAT. § 56: 8-1 *ET SEQ.* – NEW JERSEY**

**CONSUMER FRAUD ACT**

**AGAINST ALL DEFENDANTS**

179.  Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 178 above as if fully set forth herein.

180.  Defendants' acts and practices as described herein constitute unlawful, unfair or fraudulent business acts and practices.

181.  The New Jersey Consumer Fraud Act (N.J. Stat. § 56: 8-1) outlaws "[t]he act, use

or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…"  N.J. Stat. §56: 8-2.  The Act also provides for damages for all ascertainable losses, injunctive relief, and treble damages. N.J. Stat. §56: 8-19.

182. Defendants' consumer fraud acts and practices are described throughout this Complaint and include, but are not limited to, falsely reporting the true amount of WC that AIG Companies collected in New Jersey each year since approximately 1970. These acts were unlawful in, among other ways, the fact that the submission to the CBI of financial statements that contained false reports or statements regarding the business, affairs, or conditions of an insurer, with intent to deceive any public officer, office, or board to which such insurer is required by law to report, constitutes an offense punishable by fine of up to $5,000.00 per act. N.J. Stat. §§17B: 30-5, 17B: 30-17.

183. The conduct of Defendants also violated 18 U.S.C. § 1962(c), as described in greater detail above, in that Defendants, and each of them, conducted and continuously engaged in a pattern of racketeering, in violation of federal law.

184. The conduct of Defendants, and each of them, also violated the "unconscionable" prong of N.J. Stat. §56: 8-2, in that the acts set forth in this complaint cheated New Jersey's workers' compensation insurance policyholders out of tens of millions of dollars of surcharges that should have not been paid, but were paid, by the policyholders solely as a result of Defendants' misreporting of the WC premium they collected.

185. The conduct of Defendants, and each of them, was also fraudulent within the meaning of N.J. Stat. §56: 8-2 , in that New Jersey's regulators and policyholders were actually deceived by Defendants' misreporting of the WC premium they collected. As a result of

Defendants' intentional fraudulent and deceptive conduct, Plaintiff and all other Class Members were deceived into paying more in Special Purpose Fund assessments than they were obligated to pay.

186. Plaintiff and the Class Members, and each of them, have been damaged by said practices, suffered injury in fact, and lost money as a result of these unfair business practices. Pursuant to the New Jersey CFA § 56: 8-19, Plaintiff, individually and on behalf of all others similarly situated, seek restitution of money and property lost as a result of Defendants' unfair, unlawful, and fraudulent business practices.

**SIXTH CLAIM FOR RELIEF**

**UNJUST ENRICHMENT**

**AGAINST ALL DEFENDANTS**

187. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 186 above as if fully set forth herein.

188. Because of the AIG Companies' false WC premium reporting, Defendants enjoyed the benefit of paying less in Special Purpose Fund assessments over the course of an approximate 20-year period, while at the same time collecting from their own policyholders a higher amount in Special Purpose Fund surcharges than they were remitting to the State. This allowed Greenberg, AIG, and the AIG Companies to obtain and keep money and profits that they were not lawfully entitled to keep. The benefits of the wrongdoing were shared by AIG, Greenberg, and the Other Senior Managers in the form of profits, compensation, bonuses, and other benefits that they would not otherwise have received.

189. By contrast, Plaintiff and the other Class Members paid more in Special Purpose Fund surcharges than they would have if AIG Companies had accurately reported the WC premium they collected from New Jersey employers. In this way, Plaintiff unknowingly conferred an unjust benefit upon Defendants.

190. In addition, reserves were understated for decades, making additional capital available to AIG to invest that would not have been available but for the false reporting. The

availability of this additional capital enabled AIG to realize and report substantial gains due to the investment of this capital.

191.  AIG unjustly retained these substantial benefits that accrued to it from the false reporting.

192.  The retention of these benefits by AIG arising from the false reporting of WC premium violates the fundamental principles of justice, equity and good conscience.

193.  The amount by which AIG has thereby been unjustly enriched will be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of the Class, prays for relief as follows:

A.  certifying the Class or Classes identified herein and appointing Plaintiff and their counsel to represent the Class(es);

B.  awarding Plaintiff and the Class restitution and/or disgorgement of profits, in amounts to be proven at trial, and other equitable relief as the Court deems proper;

C.  awarding Plaintiff and the Class compensatory damages in an amount to be determined at trial;

D.  awarding Plaintiff and the Class treble the amount of compensatory damages;

E.  awarding Plaintiff and the Class punitive damages in an amount to be determined at trial;

F.  imposing a constructive trust upon (i) all gains, from whatever source derived, realized by Defendants as a result of Defendants' unlawful acts perpetrated on Plaintiff and the Class as alleged herein; and (ii) any other benefit realized by Defendants as a consequence of the underreporting of WC premium to the State of New Jersey;

G.  enjoining Defendants, pursuant to New Jersey CFA §§ 56: 8-2 and 8-19 and otherwise, from continuing to engage in business acts and practices, or any of them, which are unlawful, unfair, or fraudulent, as alleged herein;

H. awarding Plaintiff and the Class reasonable attorneys' and expert-witness fees and other costs, pursuant to N.J. Stat. § 56: 8-19, pre and post judgment interest pursuant to N.J. Ct. R. 4:42-11, and other statutes as may be applicable; and

I. awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of itself and all others similarly situated, hereby demands a trial by jury of all issues herein so triable.

Dated: October 8, 2013                     **NICOLL DAVIS & SPINELLA LLP**

By:      /s/ *Anthony Davis*
Anthony Davis
Jack Spinella
95 Route 17 South, Ste. 316
Paramus, NJ  07652
Phone: (201) 712-1616
Fax: (201) 712-9444
*Attorney for Plaintiff*

*Of Counsel:*
*Applications Pro Hac Vice* to be Submitted

Derek Y. Brandt *
dbrandt@simmonsfirm.com
Emily J. Kirk *
ekirk@simmonsfirm.com
John R. Phillips *
jphillips@simmonsfirm.com
**SIMMONS BROWDER GIANARIS ANGELIDES & BARNERD LLC**
One Court Street
Alton, Illinois 62002
Phone: (618) 259-2222 / Fax: (618) 259-2251

Drew E. Pomerance *
dep@rpnalaw.com
Nicholas P. Roxborough *
npr@rpnalaw.com
**ROXBOROUGH POMERANCE NYE & ADREANI**
5820 Canoga Ave., Suite 250
Woodland Hills, California 91367
Phone: (818) 992-9999 / Fax: (818) 992-9991

Deborah R. Rosenthal*
drosenthal@simmonsfirm.com
**SIMMONS BROWDER GIANARIS
ANGELIDES & BARNERD LLC**
455 Market Street, Suite 1150
San Francisco, California 94105
Phone: (415) 536-3986
Fax: (415) 537-4120

Paul J. Hanly, Jr.*
phanly@hanlyconroy.com
Andrea Bierstein *
abierstein@hanlyconroy.com
Thomas I. Sheridan, III *
tsheridan@hanlyconroy.com
**HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES LLP**
112 Madison Avenue
New York, New York 10016-7416
Phone: (212) 784-6400
Fax: (212) 213-5949